UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DARRYL L. FREEMAN,

                              Plaintiff,                           02 Civ. 9033 (PKC)

          -against-

                                                      MEMORANDUM
                                                      <u>AND ORDER</u>

GLENN S. GOORD, Commissioner of the
Dep't of Correctional Services of the State of
New York, et al.,

                              Defendants.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

           Plaintiff Darryl L. Freeman, an inmate in the custody of the Department of

Correctional Services of the State of New York ("DOCS"), brought this action pursuant to 42

U.S.C. § 1983, alleging constitutional violations by DOCS administration and staff.  He alleges,

<u>inter alia</u>, that defendants retaliated against him for previously filing a Section 1983 action

(which has since been dismissed), and violated his First, Eighth and Fourteenth Amendment

rights.  Defendants Goord, Roy, Mazzuca, Ercole and Armstrong have moved for summary

judgment on plaintiff's remaining claims.

           For the reasons explained below, defendants' motion is granted.

<u>Procedural History</u>

           Freeman filed his Amended Complaint ("AC") on January 14, 2003, naming as

defendants 16 individuals, including four John Does.[1]  Defendants moved to dismiss the action

---

[1]        In my prior opinion on defendants' motion to dismiss, I observed that 14 defendants, including two Does,
were named.  Two Does, while not appearing in the caption of the AC, were, in fact, named as defendants in the
body of the complaint, but never served.  Plaintiff has failed, at the summary judgment stage, to come forward with

pursuant to Fed. R. Civ. P. 12(b)(6).  By Order dated September 8, 2004, I dismissed, with

plaintiff's consent, all claims against defendants Block, Johnson, Smith and Travis.  Plaintiff also

represented that he did not seek to assert an Eighth Amendment claim based upon deliberate

indifference to serious medical needs, so, to the extent the AC asserted such a claim, it was

voluntarily dismissed.  See Freeman v. Goord, 2004 WL 2002927 at *1-*2 (S.D.N.Y. Sept. 8,

2004) ("Freeman I").  I also dismissed any purported claim against defendant Beasor, as the AC

did not adequately allege his personal involvement in any constitutional deprivation.  Id. at *6.

Additionally, I dismissed claims against all defendants in their official capacities as barred by the

Eleventh Amendment.  Id. at *7.

     Defendants moved to dismiss plaintiff's retaliatory urinalysis claim on the ground

of lack of exhaustion, and premised their motion on materials outside the pleadings.  I converted

that branch of defendants' motion into one for summary judgment, limited to the exhaustion

issue, and afforded plaintiff an opportunity to submit evidence in opposition to summary

judgment.  Id. at *2-*4.  After considering plaintiff's supplemental submission, I granted

defendants' motion on exhaustion grounds, and dismissed plaintiff's claim based upon a

retaliatory urinalysis.  See Freeman v. Goord, 2004 WL 2709849 (S.D.N.Y. Nov. 23, 2004)

("Freeman II").

     Familiarity with the decisions in Freeman I and Freeman II is assumed.  I will set

forth the facts relevant to the remaining claims, accepting plaintiff's version of the facts as true

together with such other facts as are undisputed, and drawing all reasonable inferences in favor

of the plaintiff.

---

the identity of the Doe defendants or explain his failure to do so.  The claims against the Doe defendants are
dismissed.

<u>Background</u>

On August 16, 1999, plaintiff filed a complaint in this district seeking damages under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment. The action was premised on alleged deliberate indifference to a serious medical condition. Plaintiff named as defendants several individuals who were then employed by DOCS at Fishkill Correctional Facility, where plaintiff was then housed. Defendant Goord, who was then, as he is now, DOCS Commissioner, was also named in plaintiff's prior suit, and is the only defendant here who was also a defendant in the 1999 action. Magistrate Judge Peck, to whom the case was assigned on consent, dismissed plaintiff's 1999 complaint at the summary judgment stage. <u>See</u> <u>Freeman v. Strack</u>, No. 99 Civ. 9878(AJP), 2000 WL 1459782 (S.D.N.Y. Sept. 29, 2000). No appeal was taken.

On January 1, 2000, plaintiff was escorted from his housing unit at Fishkill to the gym area and was administered the urinalysis discussed in <u>Freeman II</u>. When he was returned to his cell, he observed the cell being searched by defendant Armstrong and another unidentified corrections officer. (Freeman Aff. ¶¶ 3-4) Later that evening, plaintiff spoke with a Sergeant Spaulding (not a defendant in this suit), and complained that the searching officers failed to leave a "cube search slip," failed to sign the unit log book indicating that they had conducted the search, and failed to leave the cell in the condition it had been in prior to the search. (<u>Id.</u> ¶ 4)

The next afternoon, January 2, 2000, while plaintiff was doing research in the law library, he was told to gather his papers and was escorted to the mess hall, where he was frisked, handcuffed and then taken to the facility's Special Housing Unit ("SHU"). He remained in the SHU until about 7:30 p.m., when he was transported from Fishkill to Downstate Correctional Facility. (<u>Id.</u> ¶¶ 5-6) Plaintiff claims to have been housed under SHU status, which is more

restrictive than being housed with the general population of a correctional facility, for his entire stay at Downstate, a period of eight days. (Id. ¶¶ 6-7)[2] On January 7, 2000, plaintiff's security classification was changed from medium to maximum. (Ercole Decl. ¶ 20, Ex. B) Plaintiff was then transferred from Downstate to Attica Correctional Facility, departing Downstate on January 10 and arriving at Attica on January 11, 2000. (Freeman Decl. ¶ 7; Olmstead Decl. ¶ 5)

On January 25, 2000, plaintiff's wife wrote a letter to defendant Goord, inquiring as to why plaintiff had been transferred to Attica. (Roy Decl. ¶ 6) Goord forwarded the letter to defendant Roy for a response. Roy wrote back to Mrs. Freeman on February 16, 2000, and informed her that plaintiff's transfer to Attica was a result of "negative behavior."[3] (Id. ¶ 6, Ex. A)

On August 7, 2000, plaintiff wrote a letter to Goord, complaining of his transfer to Attica and the change in his security classification. In that letter, plaintiff asserted that the transfer was "based on unsubstantiated allegations that were arbitrarily and capriciously enforced without the customary and regulatory benefit of presenting such allegation for disciplinary determination." Specifically, plaintiff wrote that he was "never issued a misbehavior report, [he] never had a hearing, neither was [he] ever informed why [he] was transferred from a medium correctional facility back to a maximum correctional facility." He wrote that other inmates accused of taking part in the same alleged strike or demonstration in which the administration had accused him of being involved had been issued misbehavior reports and thus had been afforded hearings on the alleged misbehavior. Plaintiff asserted that his transfer was "for

---

[2] Although not material to the disposition of this motion, defendants contend that plaintiff was in the SHU for only five of those days, and was thereafter treated as a general population inmate. (Olmstead Decl. ¶¶ 4-5)

[3] The letters also mention plaintiff's temporary housing at Sing Sing Correctional Facility for purposes of a deposition. Plaintiff has not raised any claims related to his time at Sing Sing.

retaliatory purposes; retaliatory because I chose to exercise my first amendment right to be free from cruel and unusual punishment."  He requested that he be redesignated as a medium security inmate and moved to a facility closer to New York City.  (Roy Decl. ¶ 7; AC Ex. 12)  Defendant Roy was assigned to respond to this letter as well, and, on August 29, 2000, wrote back to plaintiff, informing him that a request for reduced security placement had already been received but, based on information received from the Office of Classification and Movement, had been denied after review and consideration.  Roy suggested that plaintiff seek the assistance of his assigned counselor for future transfer requests.  (AC Ex. 13)

On December 19, 2000, plaintiff again wrote to Goord, complaining that his transfer and change in classification were ordered despite the fact that he had not received a misbehavior report or been afforded a hearing.  He also noted that requests for a change back to medium security had been submitted in March and June 2000, but denied.  He requested a change in his security classification back to medium and a transfer to a medium security facility.  (AC Ex. 15)  Roy was once again assigned to respond to plaintiff's letter and, in a letter dated January 16, 2001, again suggested that plaintiff seek the assistance of his assigned counselor at his next quarterly review for matters regarding transfer requests.  (Roy Decl. ¶ 12, Ex. C)

On February 8, 2001, plaintiff wrote a letter to defendant Mazzuca, with copies to defendants Goord and Ercole among others, in which he described his prior section 1983 suit and described the circumstances surrounding the January 1, 2000 urinalysis and cell search and plaintiff's subsequent transfer to Downstate and then Attica.  He alleged in the letter that these actions were taken in retaliation for his prior lawsuit, and demanded that any reference to the reason for his transfer be excised from his records prior to his June 2001 parole hearing and that he be transferred back to Fishkill.  (AC Ex. 17)  Plaintiff received no response to this letter.  (AC

¶ 41)


Summary Judgment Standard

        Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

        It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. Fed. R. Civ. P. 56(e). A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Thus, in order to survive summary judgment,

plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." Id. at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998). In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

Courts review pro se pleadings carefully and liberally and interpret such pleadings "to raise the strongest arguments that they suggest." See e.g., Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citations omitted). This is especially true in the summary judgment context, where a pro se plaintiff's claims are subject to a final dismissal. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment.") (citation omitted). Plaintiff's pro se status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with "concrete evidence from which a reasonable juror could return a verdict" in his favor. LaGrande v. Key Bank Nat'l Ass'n, 393 F. Supp. 2d 213, 219 (S.D.N.Y. 2005) (citation and internal quotation marks omitted); see also Miller v. New York City Health & Hosp. Corp., No. 00 Civ. 140 (PKC), 2004 WL 1907310 at *9 (S.D.N.Y. Aug. 25, 2004). In reviewing a motion for summary judgment, the court may conduct a search of the record, and grant or deny summary judgment as the record indicates. See Fed. R. Civ. P. 56(c); New England Health Care Employees Union, District 1199, SEIU AFL-CIO v. Mount Sinai Hosp., 65 F.3d 1024, 1030 (2d Cir. 1995); Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York, 269 F. Supp. 2d 424, 446 (S.D.N.Y. 2003).

<u>Retaliation Claims</u>

In order to recover for alleged retaliation under section 1983, a plaintiff must establish the following three elements: (1) that the speech or conduct at issue is protected under the First Amendment; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the adverse action and the protected speech or conduct. <u>See</u> <u>Scott v. Coughlin</u>; 344 F.3d 282, 287 (2d Cir. 2003). Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment if they can demonstrate that they would have taken the same action against the plaintiff absent any retaliatory motivation. <u>See</u> <u>Gayle v. Gonyea</u>, 313 F.3d 677, 682 (2d Cir. 2002). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." <u>Davidson v. Chestnut</u>, 193 F.3d 144, 149 (2d Cir. 1999) (<u>per</u> <u>curiam</u>). Courts employ a "'presumption that a prison official's acts to maintain order are done for a proper purpose.'" <u>Hynes v. Squillace</u>, 143 F.3d 653, 657 (2d Cir.) (quoting <u>Rivera v. Senkowski</u>, 62 F.3d 80, 86 (2d Cir. 1995)), <u>cert.</u> <u>denied</u>, 525 U.S. 907 (1998). Thus, "'[t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.'" <u>Hynes</u>, 143 F.3d at 657 (quoting <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 535 (2d Cir. 1994)).

Courts have also taken note of the "ease with which claims of retaliation may be fabricated," and thus "examine prisoners' claims of retaliation with skepticism and particular care." <u>Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted) (affirming in part

and vacating in part grant of summary judgment); see also Dawes v Walker, 239 F.3d 489, 491 (2d Cir. 2001) (affirming grant of 12(b)(6) motion), overruled in part on other grounds by Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002).

Filing lawsuits related to prison conditions is protected conduct. "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." Colon, 58 F.3d at 872. Thus, plaintiff has satisfied the first prong of the retaliation inquiry. As regards adverse actions taken against him, he complains that his cell was searched, he was transferred out of Fishkill (briefly to Downstate and then to Attica), and his security classification was changed from medium to maximum. He also complains that, as a result of the allegedly false accusations that he was involved in planning the strike, he was denied parole.

It is on the third prong of the retaliation inquiry that plaintiff's claims fail. Beyond the conclusory assertions of a causal connection between plaintiff's prior lawsuit and the actions described above, plaintiff has proffered no evidence that the prior suit played any role in defendants' decisions to take the actions described above.[4]

---

[4]     Defendants would in any event be entitled to summary judgment on the retaliatory cell search claim. The Supreme Court has held that an inmate has no legitimate expectation of privacy in his cell and thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." Hudson v. Palmer, 468 U.S. 517, 525-26 (1984). District courts within this circuit have interpreted Hudson to mean that inmates have "no constitutional right to be free from cell searches of any kind, including retaliatory cell searches." Rodriguez v. McClenning, __ F. Supp. 2d __, 2005 WL 937483 at *6 (S.D.N.Y. Apr. 22, 2005) (collecting cases). As the only allegations against defendant Armstrong relate to the allegedly retaliatory cell search, she too is entitled to summary judgment. Plaintiff contends that his claim against defendant Armstrong is based on her "ransack[ing]" of his cell. (Freeman Dep. at 137) However, he admits that none of his property was damaged during the search. (Id. at 68-69) While plaintiff contends that the conduct of the search was in violation of a DOCS directive requiring that corrections officers, to the extent possible, leave a cell in the condition it was in prior to the search, even were that true, it would not rise to the level of a Due Process violation. See Hudson, 468 U.S. at 539-40 (deprivation of prisoner's property does not violate Due Process if adequate post-deprivation remedies are available); Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996) (New York provides adequate state court post-

Defendants, in support of their motion, have come forward with evidence of non-retaliatory motivations for the actions of which plaintiff complains. "[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted . . . ." <u>Flaherty v. Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983). Defendant Ercole – who admittedly ordered both the search of plaintiff's cell and his temporary transfer from Fishkill to Downstate – describes in his detailed affidavit the circumstances that led to the search and the transfer out of Fishkill. Briefly, the search was ordered as part of the response to a potential inmate strike planned at Fishkill. Prison officials had learned that inmates were planning to take advantage of the anticipated "Y2K" crisis which was widely expected to occur as a result of computer malfunctions attributable to the change in date from 1999 to 2000. <u>See</u>, <u>e.g.</u>, 15 U.S.C. § 6601 <u>et.</u> <u>seq.</u> (describing "Y2K" problem and promulgating rules governing civil litigation arising from problem). Specifically, officials learned that inmates planned to refuse to work or attend programs, and planned to "use force and/or intimidation against both staff and other inmates to accomplish these objectives." (Ercole Decl. ¶ 10)

When prison officials heard about the planned strike, they launched an investigation under the supervision of an executive committee, of which Ercole and defendant Mazzuca were part. (Ercole Decl. ¶¶ 5-9) Based on the investigation, it was concluded that plaintiff was one of over 30 inmates who were suspected of being involved in the planned strike, and, as such, needed to be separated from other inmates. (<u>Id.</u> ¶ 15) The recommendation that plaintiff be separated from the other inmates was based on credible information, and that recommendation was approved by the executive committee after review of that information.

_____

deprivation remedies for an inmate's loss of property).

(Id.)  Ercole states that the search was necessary to gather potential evidence related to the strike, and to ensure safety and security at the facility, and the temporary transfer of inmates implicated in the strike was necessary to prevent the strike from taking place.  (Id. ¶¶ 17-18)  The DOCS records regarding plaintiff's transfer support the assertion that the basis for the transfer was separation from the Fishkill population to prevent the planned inmate strike.  (Ercole Decl. Ex. C)

Ercole and Mazzuca have denied any motive related to plaintiff's prior lawsuit. Though plaintiff claims to have put both of these defendants on notice of his prior lawsuit, and attached to the AC typewritten memos to each of them dated "September 1999" in which he described the basis for the prior suit (AC Exs. 1 & 2), Ercole and Mazzuca have both stated that they have no recollection of receiving such memos.  (See Ercole Decl. ¶ 22; Mazzuca Decl. ¶ 22) Mazzuca states that no evidence that such a memo was received could be found in the records kept by his office, though receipt of such a document would normally be recorded.  (Mazzuca Decl. ¶ 22)  Both Ercole and Mazzuca state that plaintiff's prior suit had no bearing on their decisions regarding the search of plaintiff's cell or the transfer from Fishkill to Downstate, and that such decisions were motivated solely by concerns uncovered during the investigation of the strike.  (Ercole Decl. ¶¶ 24, 26; Mazzuca Decl. ¶ 24)

Mazzuca and Ercole each state in their declarations that they played no role in the change in plaintiff's security classification from medium to maximum, nor the decision to transfer him to Attica after such change in classification, and that such decisions are made by the "Central Office in consultation with the Office of Classification and Movement."  (Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21)  While plaintiff named as a defendant a John Doe "Classification and Movement Analyst," he has failed, after the completion of discovery, to

identify the actual individual.  In any event, as with the other alleged retaliatory actions, plaintiff has failed to come forth with any evidence of a causal connection between the classification change or transfer to Attica and his prior section 1983 suit.  Mazzuca and Ercole have similarly stated that they had no role in plaintiff's temporary assignment to the SHU while housed at Downstate, and plaintiff has failed to show any causal connection between his SHU assignment and his prior suit.  (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20)

Here, plaintiff has failed entirely to come forth with any evidence that the alleged adverse actions were motivated in "substantial part" by his filing of the prior civil rights action.  Scott, 344 F.3d at 287.  In his affidavit opposing defendants' motion, plaintiff makes the conclusory statement that "[t]he adverse action taken against plaintiff by William Mazzuca, Fishkill's Acting Superintendent and Robert Ercole, Fishkill's Deputy Superintendent of Security was retaliatory."  (Freeman Aff. ¶ 9)  Conclusory allegations of retaliatory motivation are, of course, insufficient to withstand a motion for summary judgment.  See, e.g., Scott, 344 F.3d at 287.

Plaintiff points as well to the period of just over four months that elapsed between the filing of his earlier action and the cell search and transfer out of Fishkill (with an attendant brief confinement in the SHU).  (Freeman Aff. ¶15)  Temporal proximity may serve as circumstantial evidence of retaliation.  See Colon, 58 F.3d at 872.  When the alleged retaliatory conduct takes place within a few days of the protected conduct, the temporal proximity alone may be sufficient to infer a causal connection.  See, e.g., Jordan v. Garvin, No. 01 Civ. 4393(LTS)(GWG), 2004 WL 302361 at *6 (S.D.N.Y. Feb. 17, 2004) (citation omitted) (two days).  A time lapse of over four months, however, standing alone, is insufficient to justify an inference of causal connection.  See, e.g., Cobian v. New York City, No. 99 Civ

10533(KMW)(AJP), 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases), aff'd, 23 Fed. Appx. 82 (2d Cir. 2001).  Even where the time between the protected activity and the alleged retaliatory action is as short as eleven days, summary judgment may be appropriate if the plaintiff fails to come forth with any evidence of retaliatory animus.  See Brown v. Coughlin, 965 F. Supp. 401, 406 (W.D.N.Y. 1997).  Viewed in the light most favorable to plaintiff, the four month time period, standing alone and without any evidence of retaliatory animus, would not be sufficient to permit a reasonable jury to find in plaintiff's favor.

Finally, plaintiff asserts that he was "never charged with violating any rules or regulations" such that the search and transfer could be otherwise justified.  (Id. ¶ 10, 15) However, as discussed above, defendants submitted affidavits and documentary evidence sufficient to demonstrate the reasons for the actions they took with regard to the search and the transfer out of Fishkill.  Plaintiff has failed to adduce any evidence at all to dispute those reasons.

Along with his opposition papers, plaintiff includes the affidavits of two other inmates, Abdullah Y. Salahuddin and Michael Washington.  Salahuddin merely states that he considers plaintiff to be "an open, honest and helpful educator and leader," and that he has "never known [plaintiff] to advocate anything negative or subversive."  Salahuddin further states his "belief that [plaintiff] was falsely accused of negative behavior by Fishkill's Administration after he sought legal redress against them for violating his civil rights."  He claims that similar retaliatory action was taken against him in response to his having taken "legal action," and that it is the "unwritten policy of Fishkill to get rid of any inmate that seeks legal redress against them whenever they violate a prisoners [sic] rights."  Washington similarly attests to plaintiff's good character and states that plaintiff had, in November 1999, complained that he was being harassed and "felt that he was going to be set up because of his pending legal action against certain

13

employee's [sic] at Fishkill."  Washington also states that other unidentified inmates had expressed to him their beliefs that plaintiff was "set up."  Neither of these declarations constitutes admissible evidence bearing on the question of the required causal connection between plaintiff's prior section 1983 suit and the alleged retaliatory actions at issue here.  Cf. Colon, 58 F.3d at 873 (defendant's alleged admission of the existence of a retaliatory scheme may constitute direct evidence of retaliation).

Even if plaintiff had proffered some evidence of retaliatory motivation, defendants have shown that they would have taken the same actions against plaintiff on the valid basis resulting from their investigation of the potential Y2K strike at Fishkill.  See Davidson, 193 F.3d at 149.  Plaintiff was one of over 30 inmates who were subjected to cell searches and were transferred out of Fishkill as a result of the strike investigation.  (Ercole Decl. ¶¶ 15, 17-18) Both the search and the temporary transfer were justified by the information uncovered during the strike investigation, which revealed that plaintiff was suspected of involvement in a potentially dangerous disruption of the prison's administration.  In the face of such undisputed evidence, no reasonable jury could find in plaintiff's favor.  Defendants are entitled to summary judgment on plaintiff's retaliation claims.

Due Process Claims

Plaintiff claims that his temporary confinement in the SHU at Downstate violated his constitutional right to Due Process under the Fourteenth Amendment.  Inmates alleging Due Process violations resulting from prison discipline must establish that they have a protected liberty interest in being free from the punishment in question.  See Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  While New York state law does create a liberty interest in not being

confined to the SHU, see Palmer v. Richards, 364 F.3d 60, 64 n.2 (2d Cir. 2004) (citing Welch v. Bartlett, 196 F.3d 389, 394 n.4 (2d Cir. 1999)), such an interest is only implicated in the Due Process context by a particular punishment when such punishment "'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Palmer, 364 F.3d at 64 (quoting Sandin, 515 U.S. at 484) (brackets in original). "In other words, actions under the Due Process Clause are reserved for prisoners enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison." Welch, 196 F.3d at 392.

The Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate Due Process rights." Palmer, 364 F.3d at 64 (citations omitted). However, the Second Circuit has affirmed grants of summary judgment where the period of confinement is "exceedingly short" – shorter than the 30 days at issue in Sandin itself – and there is no indication that the conditions of confinement differed significantly from those normally endured by SHU inmates. Palmer, 364 F.3d at 65-66 (citing Hynes, 143 F.3d at 658-59; Arce v. Walker, 139 F.3d 329, 335-36 (2d Cir. 1998); and Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996)).

Here, there is some dispute about the length of plaintiff's confinement in SHU conditions. Plaintiff claims to have been housed in SHU status for the entire period of his confinement at Downstate, a total of eight days. (Freeman Dep. 88-89, 14-45) Defendants contend that plaintiff was treated as an SHU inmate for five days, and then as a general population inmate for several days preceding his transfer to Attica. (Olmstead Decl. ¶¶ 4-5 and Ex. A)

However, accepting plaintiff's version of the facts, as I must in the context of this

15

motion, his eight-day confinement to SHU does not implicate a liberty interest.  The Second

Circuit recently observed that even a period of 101 days in "normal" SHU conditions is

insufficient to constitute "atypical" treatment under Sandin: "To be sure, with respect to 'normal'

SHU confinement, we have held that a 101-day confinement does not meet the Sandin standard

of atypicality."  Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citing Sealey v. Giltner, 197

F.3d 578, 589 (2d Cir. 1999)), cert. denied, 125 S. Ct. 1398 (2005).  Such "normal" SHU

conditions include confinement to a cell for up to 23 hours daily, one hour of daily exercise and

two showers per week.  Ortiz, 380 F.3d at 655.  Here, plaintiff admits that he was given his one

hour of daily exercise while housed in the SHU.  (AC ¶ 22)  The only alleged difference between

the "normal" SHU conditions described in Ortiz and plaintiff's SHU stay is his assertion that he

was not permitted to shower at all during his stay at Downstate.  (Id.)  While defendants dispute

this assertion (see Olmstead Decl. ¶ 4 and Ex. A), I accept plaintiff's version as true on this

motion; even so, that one fact would not render an eight-day stay in SHU "substantially more

grave" than normal conditions of confinement.  Welch, 196 F.3d at 392; see also Frazier, 81 F.3d

at 317 (affirming dismissal of Due Process claims where plaintiff failed to show that conditions

of 12-day SHU confinement were "dramatically different" from conditions in general

population).

      In any event, plaintiff's Due Process claims related to his brief stay in the SHU

are appropriately disposed of on summary judgment because plaintiff cannot show that any of

the named defendants were personally involved in the decision to confine him to the SHU at

Downstate.  To succeed on a section 1983 claim against state officials in their personal

capacities, a plaintiff must demonstrate "personal involvement of defendants in alleged

constitutional deprivations . . . ."  Colon, 58 F.3d at 873 (citation omitted).  Here, plaintiff alleges

in his complaint that defendants Mazzuca and Ercole were responsible for his being placed in SHU upon his arrival at Downstate. (AC ¶ 15) However, both defendants have denied in their respective declarations that they directed or requested that he be so placed, and stated that they had no involvement whatsoever in determining the conditions of his confinement at Downstate. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20) Plaintiff has failed to come forth with any evidence to the contrary, and has failed to name as defendants any Downstate personnel. Defendants are entitled to summary judgment on plaintiff's Due Process claim related to his SHU status at Downstate.[5]

To the extent that plaintiff claims that his transfer out of Fishkill constituted a Due Process violation, defendants are entitled to summary judgment. Prison officials are vested with broad discretion to transfer inmates, and such transfers between facilities do not generally implicate Due Process rights. See Meachum v. Fano, 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."); see also McKune v. Lile, 536 U.S. 24, 39 (2002); Matiyn v. Henderson, 841 F.2d 31, 34 (2d Cir.), cert. denied, 487 U.S. 1220 (1988). This is so even when a prisoner is transferred for disciplinary reasons, unless a state law imposes restrictions or conditions on transfers. See Montanye v. Haymes, 427 U.S. 236, 242 (1976). New York law does not place any such restrictions on transfers, and vests the DOCS Commissioner with discretion to order such transfers. See id.; N.Y. CORR. LAW § 23.1; see also Meriwether v. Coughlin, 879 F.2d 1037, 1047 (2d Cir. 1989). Thus, plaintiff's transfer out of Fishkill does not implicate a liberty

---

[5]     To the extent plaintiff asserts a Due Process claim based on his SHU confinement at Fishkill, the four hours he spent in SHU prior to his departure from Fishkill is insufficient to implicate a liberty interest under the principles discussed above.

interest upon which he may base a Due Process claim.

To the extent plaintiff's Due Process claim is based on the change in his security classification from medium to maximum, defendants are also entitled to summary judgment. Plaintiff's contentions regarding his security classification do not differ in any relevant manner from his contentions regarding transfer. Security classifications, like transfer decisions, are committed to the discretion of the DOCS commissioner. See N.Y. CORR. LAW § 137.1 ("The commissioner shall establish program and classification procedures . . . ."). Plaintiff essentially complains that he has been transferred to a less favorable and more restrictive institution. As discussed above, plaintiff has no liberty interest in being housed in the facility of his choice. See Meachum, 427 U.S. at 225; Montanye, 427 U.S. at 242. Defendants are entitled to summary judgment on plaintiff's Due Process claim to the extent it is based on his change in security classification.

Defendants would be so entitled even if a liberty interest were somehow to be implicated. As discussed above, defendants Mazzuca and Ercole stated in their declarations that they played no role whatsoever in the change in security classification (see Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21), and plaintiff failed to name, and thus, failed to serve, the John Doe defendant he described in the AC as a "Classification and Movement Analyst." Plaintiff also alleges that defendants Goord and Roy were informed of his allegedly improper change in security classification. Defendant Goord is entitled to summary judgment based on lack of personal involvement. "Personal involvement of a supervisory official may be established 'by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices

occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.'" Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 254 (2d Cir. 2001) (quoting Colon, 58 F.3d at 873) (alterations in original). Liability may not be based on a theory of respondeat superior. See Hayut v. State University of New York, 352 F.3d 733, 753 (2d Cir. 2003). Merely occupying a high position in the prison hierarchy does not render a defendant liable for a constitutional violation without a showing of personal involvement. See Colon, 58 F.3d at 874.

Goord's alleged liability is tied solely to his receipt of the three letters discussed earlier, two from plaintiff and one from plaintiff's wife. Goord states in his declaration that, with regard to the thousands of letters received by his office each year from or about inmates, they are opened by his secretaries, and referred to another DOCS staff member as appropriate. (Goord Decl. ¶ 4) Goord states that there is no indication in his office files that he was ever personally made aware of plaintiff's situation, and he does not recall being made aware. (Id. ¶ 6) That Goord's office received the letters and referred them for an appropriate response does not constitute the requisite personal involvement. See, e.g., Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997); Johnson v. Wright, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002) (allegation that Goord received letters to which other defendants responded insufficient to show personal involvement).

While defendant Roy did, in fact, respond to plaintiff's letters, his responses provide no evidence in support of plaintiff's claims. In response to plaintiff's August 7, 2000 letter (AC Ex. 12), Roy contacted the Office of Classification and Movement ("OCM"), which

had also been forwarded a copy of the letter. Based on information provided by that office, Roy informed plaintiff in an August 29, 2000 letter (AC Ex. 13) that his request for reduced classification had been denied. This decision was made by the Office of the Inspector General and the Deputy Commissioner for Correctional Facilities, after review of a recommendation by OCM. (Roy Decl. ¶ 7) Roy informed plaintiff that the proper method for requesting transfers and changes in security classification was through his assigned corrections counselor. (AC Ex. 13) Similarly, in response to plaintiff's December 19, 2000 letter (AC Ex. 15), Roy contacted OCM to ensure that proper procedures had been followed with regard to plaintiff's requested transfer to a medium security facility, and again informed plaintiff, by letter dated January 16, 2001 (AC Ex. 16), that he should seek the assistance of his counselor in making future transfer requests. (Roy Decl. ¶ 12)

DOCS procedure for evaluating requests for reduced security classification dictates that inmates are subject to quarterly reviews. As part of the review process, an inmate's counselor may make a recommendation for change in classification to the OCM. (Roy Decl. ¶¶ 8-9) Requests that come directly from inmates are not considered. (Id. ¶ 10) Roy did not ignore plaintiff's letters. But neither did he act with indifference or disregard plaintiff's rights. Roy's responses to plaintiff's letters were proper and could not, in any event, be said to constitute personal involvement in a constitutional violation.

Viewed in a light most favorable to plaintiff, no reasonable jury could find in his favor on his Due Process claims. Defendants are entitled to summary judgment on these claims.

Qualified Immunity

Defendants have also raised the defense of qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999) (internal quotation marks and citation omitted). The doctrine applies to prison officials in civil rights actions brought by inmates. See, e.g., Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004). A right is clearly established if (1) the underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit recognizes that right, and (3) a reasonable defendant would understand that his conduct was unlawful. Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003).

"The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." Mozzochi v. Borden, 959 F.2d 1174, 1179 (2d Cir. 1992) (citing Siegert v. Gilley, 500 U.S. 226 (1991)). As discussed above, plaintiff has failed to raise a disputed issue of material fact as to the existence of a violation of any constitutional right. Thus, I need not reach the remainder of the qualified immunity inquiry as to, for example, whether the right was "clearly established" or whether reasonable prison officials could have disagreed about the lawfulness of the alleged violations. See, e.g., Malley v. Briggs, 475 U.S. 335, 341 (1986).


Injunctive Relief

In addition to damages, plaintiff has also requested injunctive relief. Specifically,

plaintiff seeks a judicial order requiring removal from his prison records of references to "negative behavior," a "Code 04 transfer," or "involvement in any demonstration." (AC ¶ V.3) He also seeks a new parole hearing, "minus the false information that was in his prison folders, and the stigma of going before the parole board from a disciplinary maximum security prison, and involvement in a demonstration." (AC ¶ V.4) Finally, he seeks a reduction in his security classification back to medium security, and a transfer to a medium security facility. (AC ¶ V.5)

The Prison Litigation Reform Act ("PLRA") addresses an inmate's request for prospective injunctive relief:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(A). Under § 3626(g)(7), "prospective relief" is defined to include "all relief other than compensatory money damages." Thus, the court may only grant injunctive relief to the extent necessary to correct a violation of plaintiff's First or Fourteenth Amendment rights. However, as discussed above, plaintiff has failed to demonstrate any constitutional violation based on the cell search, transfer, or change in security classification.

To the extent plaintiff claims his Due Process rights were violated by his denial of parole, they fail as well. Plaintiff has no liberty interest in an initial release to parole. See Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001) ("The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release. . . . Accordingly, plaintiffs have no liberty interest in parole and the protections of the Due Process Clause are inapplicable."). Nor does the inclusion of allegedly false information in plaintiff's file implicate a liberty interest for Due Process purposes. See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), cert. denied,

485 U.S. 982 (1988). "If there is no claim of retaliation or a constitutionally flawed disciplinary hearing, an 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'" Flemings v. Kinney, No. 02 Civ. 9989(DC), 2004 WL 1672448 at *4 (S.D.N.Y. July 27, 2004) (quoting Rideout, 808 F.2d at 951) (additional citation omitted). Here, the Court has granted defendants summary judgment on plaintiff's retaliation claims. While plaintiff contends that the allegedly false information in his file resulted in the denial of parole, he does not allege that his June 2001 or June 2003 parole hearings were marked by any lack of procedural Due Process. (AC ¶ 38 (2001); Freeman Aff. Ex. B (2003)). In short, plaintiff has demonstrated no constitutional violation on which the Court could base an injunction.

Alleged Failure to Provide Discovery

In opposition to defendants' motion, plaintiff contends – for the first time – that defendants failed to adequately respond to certain of his discovery requests. (See Freeman Aff. ¶ 21) Fed. R. Civ. P. 56(f) provides that, when a party opposing summary judgment makes a showing that he cannot present facts essential to justify his opposition, a court may order a continuance for the purpose of allowing further discovery. In support of his assertion, plaintiff attaches a copy of his undated request for the production of documents, and defendants' response, dated May 19, 2005. (Freeman Aff. Ex. C)

Defendants' responses, on their face, appear to be appropriate. Plaintiff asserts no basis for his belief that defendants have in their possession, custody or control documents responsive to Request No. 6 (requesting documents related to "[t]he Authority that approved the Transfer Order on Sunday January 2, 2000, and based on what available evidence") which were

not, in fact, produced. While defendants objected in part to Request No. 12 (requesting documents related to "[t]he evidence that was ascertained to substantiate the extreme measures taken by Fishkill's Administration under the authority of the Department of Correctional Services (D.O.C.S.)"), they also referred plaintiff to the documents produced in response to the arguably similar Request No. 6. In response to Request No. 13 (requesting documents related to "[t]he unusual incident report"), defendants objected to the request as unclear in that it did not specify what "unusual incident report" was being referenced, but also stated that they were not in possession of "any unusual incident report related to plaintiff's movement to Downstate Correctional Facility in January, 2000." Request No. 14 read as follows: "What steps did the approving Authority take to be in compliance with NYCRR Title 7 procedures that regulate how actions are conducted in conjunction with State Law." The Court agrees with defendants that the request does not make clear what documents plaintiff sought.

This case was referred to Magistrate Judge James C. Francis IV for general pretrial supervision, including all discovery matters, on February 20, 2003. Plaintiff included in his papers in opposition to summary judgment a letter to defendants' counsel dated June 20, 2005, in which he complains about defendants' responses to his document requests, which letter purports, on its face, to have been copied to Magistrate Judge Francis. (Freeman Aff. Ex. C) There is no indication in the record that plaintiff ever sought a ruling from Magistrate Judge Francis on any of the alleged shortcomings in defendants' discovery responses. Plaintiff has failed to make the showing required under Rule 56(f) that he cannot present facts essential to justify his opposition to summary judgment because of a lack of discovery. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to

be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir.), cert. denied, 540 U.S. 823 (2003) (citations and internal quotation marks omitted). Plaintiff's argument provides no basis on which to deny summary judgment.

Conclusion

For the reasons set forth above, defendants' motion for summary judgment is GRANTED.[6] The Clerk is directed to enter a judgment in favor of defendants.

SO ORDERED.

Dated: New York, New York
December 7, 2005

P. Kevin Castel
United States District Judge

---

[6] Though the motion was nominally brought only on behalf of defendants Goord, Roy, Mazzuca, Ercole and Armstrong, summary judgment is granted to all named defendants. Defendant Conklin was never served with the AC. Defendant Zehr was served, and failed to answer or otherwise appear in this action. However, the sole allegation in the complaint relating to Zehr is that, on January 2, 2000, he "escort[ed] plaintiff from the law library area to the Messhall [sic] area." (AC ¶ 11) Plaintiff does not explain how this allegation is sufficient to implicate Zehr's involvement in any alleged constitutional violation, and the Court cannot conceive of how it might.